**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------x
CHEYENNE CARTER,

               Petitioner,      :      **REPORT & RECOMMENDATION**

                             :

        -against-         :      **06 Civ. 13552 (SHS)(MHD)**

                             :

SUPERINTENDENT ROBERT
ERCOLE,                     :

               Respondent.   :
--------------------------------x

**TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.:**

    Petitioner Cheyenne Carter seeks a writ of <u>habeas</u> <u>corpus</u> to challenge his December 14, 1999 conviction in New York State Supreme Court, Bronx County, of one count of Murder in the Second Degree. Petitioner, along with co-defendant Donald Saxon, was found guilty on November 17, 1999 of murdering Luis Pagan on June 25, 1994 by beating him so severely that he died four days later. Petitioner is currently serving a prison term of twenty-five years to life.

    Petitioner raises two grounds for habeas corpus relief in his timely filed petition. First, he contends that the prosecution violated his right to due process of law by failing to turn over four documents to the defense during his trial, in violation of the principles of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny. (Pet. ¶¶ 16-17). Second, he argues that the evidence presented at trial was legally insufficient to support his

conviction of depraved-indifference murder under the correct interpretation of the pertinent statute, New York Penal Law § 125.25(2). (Id.). These arguments are identical to the claims made by his co-defendant Donald Saxon in Saxon's petition for a writ of habeas corpus. (Pet. ¶ 15). Because petitioner adopts Saxon's petition and accompanying memoranda in their entirety (see Pet. ¶ 16; Pet'r's Reply Mem. of Law at 1), and respondent makes the same arguments in opposition (see Resp't's Mem. of Law at 21-80), this report is taken, in large measure, in haec verba from our Report & Recommendation in Saxon v. Ercole, 06 Civ. 7728 (SHS) R & R.

In opposition to the petition, respondent argues that the suppression of the documents at issue did not amount to a Brady violation because two of them could have been discovered with due diligence, and all four were cumulative of evidence presented, and thus not material. (Resp't's Mem. of Law at 23-63). As for petitioner's legal-insufficiency claim, respondent contends that it is unreviewable by this court because it was rejected by a state court on an independent and adequate state-law ground, and that in any case it is meritless. (Id. at 64-80).

For the reasons that follow, we recommend that the writ be denied and the petition dismissed with prejudice.

I. <u>Trial</u>

Petitioner was indicted on four counts –– murder in the second degree on an intentional-killing theory (acting in concert with Saxon), murder in the second degree on a depraved-indifference theory, manslaughter in the first degree, and criminal possession of a weapon in the fourth degree. (Trial Transcript, <u>People v. Carter et al.</u>, Ind. 3777/97 at 23-25 (N.Y. Sup. Ct. 1999) (hereinafter, "Tr.")). Petitioner's trial commenced on October 18, 1999 before the Hon. John Moore, S.C.J., and a Bronx jury.

Trial witnesses testified that shortly after midnight, Mr. Pagan, along with others, was waiting in line at the 24-hour window of Kelly Grocery, a small grocery store located at the corner of Kelly Street and 163rd Street in the Bronx. Petitioner and co-defendent Saxon cut in front of Pagan in line, and a brief argument ensued. (Tr. 500-502, 1330-31, 1362-63). Petitioner struck Pagan on the head with a large beer bottle, and he and Saxon then began to punch Pagan in the head and face. (<u>Id.</u> at 503-504, 1331-35, 1362-63, 1402). Pagan attempted to shield his face from their blows, and eventually fell to the ground. (<u>Id.</u> at 504,

1335). Petitioner and Saxon proceeded to stomp on Pagan's head, and the two defendants, each holding one of his arms, then rammed him headfirst into the metal security gate of a closed Chinese restaurant.[1] (Id. at 279-81, 913-17, 924-26, 1338-42). At one point during the beating, Pagan's body began shaking. (Id. at 1341). Leaving him alive but bleeding profusely, petitioner and Saxon crossed the street, "high-fiving" each other and laughing. (Id. at 187, 285-87, 927, 1342-44, 1506.)

A block away, Police Sergeant Michael Perry and Officer Edward Quinones were flagged down by an unknown individual while patrolling the area in a marked car. (Id. at 1495-96). The individual advised them that a man had been shot at the corner of Kelly Street and Intervale Avenue. (Id.). When they arrived at the scene, Luis Pagan was lying on the sidewalk, and a small crowd of onlookers had gathered. (Id. at 1498-99). Sergeant Perry exited his vehicle and approached Mr. Pagan. Sergeant Perry testified that when he arrived, Pagan's eyes were blackened, his face was swollen, and blood was "oozing out of the side of his face and out of his mouth." (Id. at 1501). Although Sergeant Perry testified that he believed Mr. Pagan's injuries were consistent with a

---

[1]One witness, Stephen Feliciano, testified that after dropping Pagan to the ground Saxon beat him with a cane while petitioner continued stomping on his face and the upper part of his body. (Tr. 282-83).

gunshot wound to the face or with blunt force trauma, he radioed for an ambulance, reporting that he "had a man shot in the face." (Id. at 1501-03).

Shortly after Sergeant Perry's radio transmission, Officers Michael Greaney and Anthony Petalvo arrived on the scene. (Id. at 1503). When the ambulance failed to come promptly, the officers placed Mr. Pagan in the back of Officer Greaney's car and transported him to Lincoln Hospital. (Id. at 1504-06).

After four days of treatment by physicians at Lincoln Hospital, Mr. Pagan was pronounced dead on June 28, 1994. (Id. at 1467). His body was subsequently transported to the Medical Examiner's office, accompanied by a form completed by Lincoln Hospital staff which indicated that his fatal injury was a gunshot wound and suggested the possible path of a bullet through his face. (Id. at 1482). After completing an autopsy of Mr. Pagan's body, Dr. Josette Montas, a forensic pathologist, listed the causes of death on Mr. Pagan's death certificate as "multiple blunt impacts to the head and the neck with fractures of the skull, fractures of facial bones, neck, larynx, and gunshot wound." (Id. at 1478). No bullet fragments were recovered from Mr. Pagan's body by either Dr. Montas or Lincoln Hospital staff, and no stippling was observed. (Id. at 1456, 1458-59). Additionally,

the crime scene detectives discovered no ballistics evidence. (<u>Id.</u> at 129, 140-41).

Dr. Montas testified at trial that upon review of her report after learning that witnesses to the murder had indicated that no gun had been used, she had concluded that she was mistaken in listing a gunshot wound as a cause of death. (<u>Id.</u> at 1483-84). Testifying as an expert in forensic pathology, she opined at trial that Mr. Pagan's death had resulted from "multiple blunt impacts...to the head, the neck, with fractures of skull, facial bones, larynx, injury to the brain." (<u>Id.</u> at 1480). When questioned about changing her opinion, Dr. Montas explained that the lacerations that she had initially interpreted as possible entrance and exit wounds were also consistent with injuries caused by bone protruding through the skin. (<u>Id.</u> 1456-60). In Mr. Pagan's case, which she characterized as "difficult," it was most likely that the lacerations in question, located on his right temple and below his lower lip, were caused by bone or teeth protruding through his skin. (<u>Id.</u> at 1455-60). She also stated that the laceration on his right temple was consistent with his having been struck on the head with a bottle or sharp object. (<u>Id.</u> at 1456-60). Finally, Dr. Montas explained that either a gunshot wound or blunt force trauma can cause the sort of diffuse bruising and swelling visible on Mr. Pagan's face after the beating. (<u>Id.</u> at 1463).

Four eyewitnesses to the crime testified in the Pagan murder trial: Juan Dume, the manager of Kelly Grocery; Elvira Viera, who was in the area buying crack; and Stephen Feliciano and Jose Rodriguez, who were selling drugs at the corner of 163rd Street and Kelly Street. All four identified petitioner as one of the perpetrators. Dume, Feliciano, and Rodriguez identified Saxon as the other perpetrator. Three more witnesses -- Jose Feliciano, Marqueo Stroud, and Arnold Rodriguez -- testified that on separate occasions petitioner had admitted to them individually that he had murdered Mr. Pagan.

Stroud and Arnold Rodriguez were both members of a drug organization known as the "Bryant Boys," and they testified pursuant to federal cooperation agreements. (Id. at 579, 611-16, 828-32, 1204-1205). Jose Rodriguez, Jose Feliciano, and Stephen Feliciano were members of another drug organization labeled the "Kelly Boys," and they also testified pursuant to federal cooperation agreements. (Id. at 213-16, 1260-68, 1307-11). All five described their criminal histories in detail, disclosed the prison sentences they were facing, and stated that they hoped that their cooperation would result in the issuance of section 5K1.1 letters on their behalf by the Government, recommending lighter sentences. (Tr. 216-16, 611-13, 665-69, 726-29, 827-28, 1099-1100, 1298-1311); See U.S.S.G. § 5K1.1.

Petitioner's attorney argued in summation that Mr. Pagan had been shot in the course of a robbery, not beaten to death by petitioner and Saxon. (Id. at 1562-74). He emphasized the testimony of police officers who initially thought that Mr. Pagan had been the victim of a gunshot wound, as well as the apparent diagnosis of a gunshot wound in Mr. Pagan's medical records from Lincoln Hospital, and also cited the testimony of Elvira Viera and Luis Pagan's daughter that they had heard shots fired.[2] (Id. at 1571-72). He noted that Mr. Pagan's wife and sister had both testified that he was wearing a watch, a wrist chain, and a neck chain when he left the house that night, and that no jewelry had been vouchered by the police when he was admitted to the hospital. (Id. at 1593.) Counsel suggested that Jose Feliciano had arranged with the other cooperating witnesses to frame Carter and Saxon because Carter had had an affair with Feliciano's long-time girlfriend. (Id. at 1590-92). Finally, he attacked the credibility of the cooperating witnesses based on their extensive criminal histories, arguing that the cooperation agreements did not provide a motive to tell the truth, but rather a motive to lie in order to achieve sentence reductions, which, because most of the cooperating

---

[2]In contrast, Stephen Feliciano, Juan Dume, and Jose Rodriguez testified that no shots had been fired. (Tr. 434, 930-31, 1372).

witnesses were young men facing life terms, they desperately wanted. (Id. at 1575-78, 1581-82, 1586-90). As for the other witnesses, he suggested that Juan Dume, the storekeeper, was actually associated with the Kelly Boys, and observed that he had admittedly lied to the police when initially questioned about the beating.[3] (Id. at 1584-85). He also noted that Elvira Viera had consumed ten vials of crack during the day preceding the murder and that she suffered from auditory hallucinations. (Id. at 1580-81).

Trial counsel for Saxon concurred with petitioner's attorney's summation and emphasized that only three witnesses had identified Saxon as a participant in the beating: Juan Dume, Stephen Feliciano, and Jose Rodriguez. (Id. at 1596). He suggested that Feliciano and Rodriguez were simply lying to get their sentenced reduced, and expanded on the argument that Juan Dume was associated with the Kelly Boys, citing three facts: 1) Mr. Dume's store was once raided by the DEA (though no contraband was found), 2) Mr. Dume co-signed a $120,000 bail bond for Angelo Cartagena, allegedly a member of the Kelly Boys, and 3) Stephen Feliciano testified that he had discussed a murder with another Kelly Boys member inside Mr. Dume's store. (Id. at 1596-98).

---

[3]Dume testified that he had initially lied because he was afraid to get involved in the case and because he was questioned in his store, with the drug dealers right outside. (Tr. 992-93).

The prosecutor contended that Saxon and petitioner had murdered Mr. Pagan to enhance their reputation in the neighborhood. (Id. at 1606-1608). She relied on the eyewitness testimony, petitioner's admissions of guilt to Feliciano, Stroud, and Arnold Rodriguez, and police testimony that both defendants had been arrested in Pennsylvania with falsified I.D. cards. (Id. at 1606-13 1620-21). She responded to the attacks on the State's witnesses' credibility by arguing that Juan Dume and Elvira Viera had no motive to lie, and that the cooperating witnesses had to tell the truth to keep their federal cooperation agreements. (Id. at 1614-16, 1627-32). Finally, she responded to the robbery theory by pointing out that although Mr. Pagan's jewelry was missing, his wallet had been vouchered. (Id. at 1638.)

On November 17, 1999, the jury acquitted both defendants of intentional-killing murder, but convicted them on a depraved-indifference theory. (Id. at 1769-1776). On December 14, 1999, Justice Moore sentenced both defendants to the maximum term, 25 years to life, finding nothing mitigating in either of their backgrounds. (Sentencing Transcript at 21-22, 26-27).

II. <u>Direct Appeal</u>

On direct appeal, petitioner argued that the evidence was not
legally sufficient and that the verdict was against the weight of
the evidence, and that the sentence imposed was unduly harsh and
excessive. (Aff. of Ass't Dist. Attny. Joshua F. Magri, sworn to
May 10, 2007, at Ex. 4, pp. 37-46). The Appellate Division
unanimously affirmed the verdict, holding that the conviction was
based on legally sufficient evidence and that it was not against
the weight of evidence, and it upheld petitioner's sentence,
stating, "We perceive no basis for a reduction in sentence." <u>People
v. Carter</u>, 294 A.D.2d 189, 741 N.Y.S.2d 690 (1st Dep't 2002). The
court also referred to the decision in Saxon's direct appeal, in
which the court had held that "[i]ssues of credibility ...were
properly considered by the jury and there [was] no basis to disturb
its determinations[,]" and furthermore, that the evidence presented
at trial "supported the conclusion that the cause of death was
blunt trauma to the head and neck, not a gunshot wound." <u>People v.
Saxon</u>, 292 A.D.2d 283, 284, 739 N.Y.S.2d 255, 256 (1st Dep't 2002).
The New York Court of Appeals denied leave to appeal from the
Appellate Division's ruling. <u>People v. Carter</u>, 98 N.Y.2d 709, 749
N.Y.S.2d 6 (2002).

III. <u>The Section 440.10 Motion</u>

Events in 2002 led petitioner to file a motion to vacate the judgment against him under N.Y. Crim. Proc. L. § 440.10. Petitioner discovered that during the Pagan murder trial, he had been indicted for the 1995 murder of Jamie David. Two of the witnesses against Carter in the Pagan trial –- Marqueo Stroud and Arnold Rodriguez -- had also testified in front of the Jamie David grand jury concerning his alleged involvement in the David murder. The prosecutor handling the Pagan trial, who was also the prosecutor in the grand jury proceedings regarding the David murder, had informed petitioner that he was the subject of a grand-jury presentation and offered him an opportunity to testify, but had given him no further information about the proceedings, save a redacted transcript of Rodriguez's grand-jury testimony, which did not indicate the crime for which petitioner was being indicted. (<u>See</u> Saxon Pet. at Ex. D).

The Jamie David murder trial began on February 25, 2002, more than two years after the conclusion of the Pagan trial, with petitioner, Donald Saxon, and Lamont Beazer as co-defendants. At some point during the pre-trial discovery process, the prosecutor turned over two ballistics documents to defense counsel. The first was a request dated April 8, 1997 for a comparison between .380

spent shell casings recovered from two homicide scenes, which were identified by victim, complaint number, and ballistics case number. One scene was labeled "Victim: Luis Pagan," and the other was labeled "Victim: David Jaime." (Magri Aff. at Ex. 14). The other ballistics document, dated November 11, 1997, reported negative results for the comparison, identifying the evidence compared only by the ballistics case numbers associated with each set of spent casings. (Id. at Ex. 15).

In the David murder trial, Marqueo Stroud testified for the prosecution. On cross-examination, Saxon's trial counsel impeached Stroud by revealing that Saxon had been incarcerated at the Groveland Correctional Facility in Livingston County, New York on August 11th, 1995, the date of the David murder. (Trial Transcript, People v. Beazer et al., Ind. 6117/99, at 269)(N.Y. Sup. Ct. 2002). The next day, the prosecutor moved to dismiss all charges against both Saxon and petitioner. (Id. at 401).

In January of 2003, petitioner made a motion to vacate the judgment of conviction entered against him in the Pagan trial pursuant to N.Y. Crim. Proc. Law § 440.10, Article 1, section 6 of the New York Constitution, and the 14th Amendment. First, he argued that the prosecution's failure to turn over the two ballistics

documents and the portions of the grand-jury testimony of Arnold Rodriguez and Marqueo Stroud in which they had falsely accused Saxon of being present at, and participating in, the murder of Jamie David violated the principles of Brady v. Maryland. (Magri Aff. at Ex. 6, ¶ 9). Second, Carter argued that his conviction should be vacated on the state-law grounds of newly discovered evidence. (Id. at ¶¶ 10-13). Additionally, petitioner stated he would join any post-verdict motion submitted by Saxon. (Id. at p. 1).

The court granted the 440.10 motion to the extent of holding an evidentiary hearing concerning the ballistics documents. During the hearing, Saxon filed a supplemental motion seeking to set aside the conviction pursuant to the then newly-decided New York Court of Appeals case People v. Payne, 3 N.Y.3d 266, 786 N.Y.S.2d 116 (2004), and petitioner orally joined in that application. (Magri Aff. ¶ 16). In Saxon's supplemental papers he argued that, if credited, the prosecution's evidence proved intentional murder, not depraved indifference murder, and thus was legally insufficient to support his conviction.

The State presented several witnesses at the section 440.10 hearing: Joseph Marrero, a retired detective who was involved in

both the Luis Pagan homicide investigation and the Jamie David investigation and whose signature appeared on the ballistics comparison request at issue; Detective Peter Tarsnane, who also worked on both investigations; Detective Kevin Barry, who was assigned to the Firearms Analysis Section and received the ballistics comparison request; Detective John Deguilio, who was assigned to the crime scene unit that responded to the Luis Pagan crime scene; Deputy Sheriff Anthony Tota, a retired detective formerly assigned to the ballistics unit who received the shells from the Alberto Ramirez crime scene; and Detective Michael Greaney, who was the first officer on the scene of the Pagan murder.

At the hearing, the State's witnesses testified, in sum, that no ballistics evidence had been recovered from the scene of the Pagan murder and that Pagan's name had appeared on the ballistics comparison request as the result of a clerical mistake. The state court credited that testimony and found that:

> there is no "reasonable possibility" or "reasonable probability," that the failure to disclose these documents contributed to the jury's verdict. Indeed, the testimony adduced at the hearing clearly establishes, that there was no ballistics evidence seized in the Luis Pagan case, a position consistent with the evidence adduced at trial...Furthermore, although the request for ballistics comparison, People Exhibit #1 does reference the victim as Luis Pagan, the ballistics number, and the complaint number listed thereon pertain to the Alberto Ramirez homicide. The deceased was mistakenly listed as

Luis Pagan.  Indeed, the ballistics evidence referred to in the request for comparison as well as the actual ballistic[s] evidence that was tested by the ballistic[s] unit pertained to the Alberto Ramirez case which was wholly unrelated to the Pagan murder and occurred some three months prior to the Pagan slaying.  Thus, while these documents were not made available to defense counsel during trial, they would at best, have served as additional impeachment material, that the People could have rebutted and the failure to provide these documents does not warrant a new trial.

(Magri Aff. at Ex. 24, p. 18). As for the withholding by the prosecutor of portions of the grand-jury testimony of Rodriguez and Stroud, the court made the following findings:

With respect to the Grand Jury testimony of Arnold Rodriguez and Marqueo Stroud, this too would have been further impeachment material for cross-examination, however, in this Court's opinion this would not have affected the resulting verdict....Indeed, the criminal backgrounds of the people's 'cooperating' witnesses were meticulously and vigorously explored before the jury.

(Id. at 18-19). Justice Moore also rejected petitioner's argument that the Assistant District Attorney should have known that the grand jury testimony of Rodriguez and Stroud was false or perjured, citing her expeditious dismissal of the charges against Carter after receiving proof that Saxon had been incarcerated on the date of the David murder. (Id. at 23).

The court also rejected petitioner's section 440.10(g) claim that the same documents were newly discovered evidence warranting

a new trial. Justice Moore ruled that although Carter had shown that he could not have discovered the evidence by the time of trial even with due diligence, he had failed to establish that the proffered evidence was "of such a character or quality as to create the probability of a more favorable verdict to the defendants upon retrial." (Id. at 24-26).

Finally, the state court analyzed petitioner's legal-insufficiency claim premised on the interpretation of New York Penal Law section 125.25(2) in People v. Payne, 3 N.Y.3d at 270-73, 786 N.Y.S.2d at 117-20. While acknowledging that Payne had established that depraved-indifference murder is an inappropriate charge in cases in which there is a "'manifest intent to kill,'" and that "'the more the defendant shoots (or stabs or bludgeons) the victim, the more clearly intentional is the homicide'" (Magri Aff. at Ex. 24, p. 32 (citing Payne, 3 N.Y.3d at 271-72, 786 N.Y.S.2d at 118-19)), the state court focused on the discussion in Payne of cases involving uncommon brutality "'in which -- although the intent to kill is absent -- the defendant's utter depravity in causing the victim's death warrants punishment in excess of that available for manslaughter.'" (Id. at 35 (citing People v. Suarez, 6 N.Y.3d 202, 211, 811 N.Y.S.2d 267 (2005) (citing Payne, 3 N.Y.3d at 271, 786 N.Y.S.2d at 118-19))). Finding that the Pagan murder involved an "instantaneous, impulsive beating," the trial court

held that the jury could have reasonably concluded that it was inflicted without the intent to kill, but "under circumstances evincing a depraved indifference to human life," and it therefore rejected petitioner's legal-insufficiency argument. (<u>Id.</u> at 39-40).


IV. <u>The Current Petition</u>


After the First Department denied petitioner's application for leave to appeal the denial of his 440.10 motion on August 3, 2006 (Pet. ¶ 13), Carter filed a petition for a writ of habeas corpus in this court on November 29th of the same year. The habeas petition largely mirrors the claims raised by petitioner in his 440.10 motion; specifically, that suppression of the two ballistics documents and of excerpts from the two grand-jury transcripts violated <u>Brady</u>, and that the evidence was legally insufficient to satisfy the elements of New York Penal Law § 125.25(2) as interpreted by <u>People v. Payne</u>. (Pet. ¶¶ 15-17). Respondent argues in opposition that the ballistics reports and grand-jury transcripts were not material, that the grand-jury transcripts were not suppressed by the prosecutor, that <u>Payne</u> does not apply retroactively, and that even if it did apply the evidence would be legally sufficient. Respondent further argues that petitioner is barred from raising his legal-insufficiency claim in a habeas petition because the state trial court rejected it on independent

and adequate state-law grounds, since it commented in its order that the legal-insufficiency claim "could have and should have been raised in petitioner's direct appeal." (Magri Aff. at Ex. 24, p. 39).


## ANALYSIS


## I. Standard of Review


To the extent that the state trial court addressed a claim advanced by Carter and rejected it on the merits, this court may grant a writ of habeas corpus on that claim only if we find that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2). Clearly established federal law "refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v. Miller, 289 F. 3d 36, 42 (2d Cir. 2002)).

A decision is "contrary to" clearly established federal law "'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). A decision is an unreasonable application of federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407. The Supreme Court observed in Williams that "unreasonable" does not mean merely "incorrect" or erroneous. Id. at 410-11. Rather, "[s]ome increment of incorrectness beyond error is required[.]" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). However, "the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Id. Thus, on review, we accord the state-court decision deference unless it is "objectively unreasonable." Williams, 529 U.S. at 409.

Petitioner argues that the state court's conclusions as to the materiality of the withheld documents and its rejection of his legal-insufficiency claim were unreasonable applications of clearly established federal law. (See Pet. ¶¶ 15-16; Pet'r's Reply Mem. of

Law at 1 (adopting memoranda filed in support of Saxon Pet.); Saxon Mem. of Law at 41-45). More specifically, he contends that the state court should have found the withheld documents material under the principles of <u>Brady</u> and its progeny, and should have concluded that his conviction for depraved-indifference murder violated the Due Process Clause in that the evidence proffered was not sufficient for any rational trier of fact to find the elements of depraved-indifference murder beyond a reasonable doubt under New York law.

II.  <u>Brady Claims</u>

We begin by summarizing the standards that govern <u>Brady</u> claims. In <u>Brady v. Maryland</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. at 87. To establish a <u>Brady</u> violation, the petitioner must satisfy three tests. First, he must show that the evidence at issue was favorable to him, either because it is exculpatory or impeaching. <u>See</u>, <u>e.g.</u>, <u>Strickler v. Greene</u>, 527 U.S. 263, 282-83 (1999). Second, he must demonstrate that the evidence was suppressed by the prosecution. <u>Id.</u> Finally, the evidence must be material. <u>See</u> <u>id.</u>; <u>Kyles v.</u>

Whitley, 514 U.S. 419, 433 (1995).

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The reasonable-probability standard does not require "demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in the defendant's acquittal[,]" nor must the defendant "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434-35. Rather, the question is whether the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434. In making that determination, the court must analyze the potential impact of the suppressed evidence "collectively, not item-by-item." Id. at 436. Finally, if the court decides that the suppressed evidence was material, the defendant is deemed to have been prejudiced, obviating the need for further harmless-error review. Id.

Petitioner does not argue that the state court incorrectly identified the elements of a Brady claim. Rather, he argues that the state court's conclusion that the ballistics documents were not material rested on factual findings that were neither relevant to materiality nor fairly supported by the record. As for the state

22

court's conclusion that the grand-jury transcripts were simply cumulative impeachment evidence that pertained to non-essential corroborative witnesses, petitioner argues that if the state court had properly analyzed the significance of the suppressed transcripts, it would have concluded that they represented impeachment material of such a powerful quality that had they been used at trial, they would have undermined the credibility of all of the eyewitnesses testifying pursuant to cooperation agreements, creating a reasonable doubt as to petitioner's guilt. Analyzed collectively, petitioner contends, the withheld evidence "would have undermined the two linchpins of the prosecution's case: 1) that its Kelly Boys gang witnesses were truthful; and, 2) that, consistent with the testimony of the gangster witnesses, Luis Pagan had not been shot." (See Pet'r's Reply Mem. of Law at 1; Saxon Mem. of Law at 34). Thus, according to Carter, there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.


In applying the limited-review provisions of section 2254(d) to a state court's decision on a Brady claim, we bear in mind that the decision as to materiality is "'a mixed question of law and fact.'" See, e.g., United States v. Payne, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting United States v. Rivalta, 925 F.2d 596, 598 (2d

Cir. 1991)). Thus, the habeas court's assessment of the state court's materiality decision looks to whether the state court's findings of fact are permissible in light of the record before it and, if so, whether, given the facts that the state court found, its conclusion as to materiality was either contrary to, or an unreasonable application of, well established Supreme Court precedent. <u>See</u>, <u>e.g.</u>, <u>Boyette v. Lefevre</u>, 246 F.3d 76, 90-91 (2d Cir. 2001). The state court's findings of fact, in turn, are presumed correct under 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) unless rebutted by clear and convincing evidence.

In determining materiality for <u>Brady</u> purposes, the state court may rely on its own assessment -- where pertinent -- of the credibility of trial witnesses. <u>See</u>, <u>e.g.</u>, <u>Boyette</u>, 246 F.3d at 92 (discussing credibility of witnesses as relevant to materiality question). Insofar as it makes such an assessment, the state court's findings as to the credibility of witness at trial, and -- in this case -- at an evidentiary hearing, are also governed by sections 2254(d)(2) and (e)(1). <u>See</u> <u>Shabazz v. Artuz</u>, 336 F.3d 154, 161 (2d Cir. 2003) ("[The 2254(e)(1)] presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility.").

We therefore review the state court's legal analysis of the significance of the two sets of suppressed documents, as well as the evidentiary support for its factual conclusions concerning the ballistics documents, and then determine the reasonableness of its conclusion as to their potential collective impact on the trial.

A. <u>The Ballistics Documents</u>

Two of the documents that are the subject of petitioner's <u>Brady</u> claim are ballistics documents. The first is a ballistics comparison request form which asks for a comparison of two sets of shell casings recovered in connection with two different murder cases. (Magri Aff. at Ex. 14). The cases are identified by complaint number, by ballistics number, and by the name of the victim. The first case listing contains the words "Victim: Luis Pagan" and a ballistics number and a complaint number associated with a different case, the Alberto Ramirez homicide. The second ballistics document reports the results of the requested analysis as negative, identifying the ballistics evidence compared only by ballistics numbers. (Magri Aff. at Ex. 15).

There is no dispute that the ballistics comparison request and the accompanying results report were favorable to Carter, given his gunshot theory, nor is there a dispute that these documents were suppressed. The only issue before us is the reasonableness of the state court's conclusion that, alone or combined with the suppressed grand-jury transcripts, they were not material.

Petitioner attacks that conclusion with a two-part argument. First, he challenges the state court's finding of fact that the appearance of Mr. Pagan's name on the ballistics comparison request was the result of a clerical error. Then, arguing that the state court's finding was in any event irrelevant to the question of what view the jury would have taken of the documents, he contends that the jury would have had a substantial basis to conclude that it was in fact not a clerical mistake, in which case the ballistics documents would have been important impeachment material that the defense could have used to undermine the prosecution's theory that Pagan had been beaten to death.

The parties dispute the proper place in the materiality analysis of the state court's finding that the appearance of the words "Victim: Luis Pagan" on the ballistics comparison report was mere clerical error. Petitioner contends that the state court's factual finding was not a proper basis for its materiality analysis

because "the real issue...is what impact the undisclosed evidence reasonably could have had on the jury" had the defense had the opportunity to present the ballistics reports. (Pet'r's Reply Mem. of Law at 1; Saxon Mem. of Law at 11-14)(emphasis in original)). Respondent, on the other hand, claims that "when this Court examines whether the state court reasonably applied Brady in terms of materiality, it must not analyze these reports as simply reports containing Mr. Pagan's name, but as reports that mistakenly [bear] Mr. Pagan's name." (Resp't's Mem. of Law at 34).

Petitioner's argument is undermined by the operation of the 28 U.S.C. § 2254(e)(1) presumption of the correctness of a state court's findings of fact. Here, the state court was entitled to rely on its own credibility determinations in analyzing whether there was a reasonable probability that, had the ballistics documents been introduced at trial, the jury's verdict would have been different. See, e.g., Shabazz, 336 F.3d at 163 ("Credibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing."). We are required to defer to its determination that the State's witnesses testified credibly that no ballistics evidence was recovered from the Luis Pagan crime scene. (See Magri Aff. at Ex. 24, p. 18 ("the testimony adduced at the hearing clearly establishes, that there was no ballistics evidence seized in the Luis Pagan case, a

position consistent with the evidence adduced at trial[.]"). Since petitioner has not presented clear and convincing evidence to the contrary,[4] we conclude that the inclusion of Mr. Pagan's name on one of the ballistics documents indeed represents merely a clerical mistake. Against this backdrop, we evaluate the reasonableness of the state court's conclusion as to the materiality of the ballistics documents.

### 1. The Evidentiary Hearing

The state court held an evidentiary hearing to explore the significance of the ballistics documents that petitioner claims are <u>Brady</u> material. In that hearing, the prosecutor presented several witnesses. Officer John Deguilio, who worked for the 41st precinct Bronx Narcotics Crime Scene Unit at the time of the Pagan murder (the unit that was responsible for collecting evidence from the crime scene), testified that he and his partner "did a walk through" of the crime scene with a large flashlight looking for ballistics evidence, such as discharged shells, copper jacketing, lead bullets, and ballistics impact marks, but recovered nothing. (Transcript of 440.10 Hearing 43-46, 49-50)(hereinafter, "Hr'g

---

[4]Petitioner also does not satisfactorily explain away the fact that the request document contained a ballistics number and complaint number derived from the Alberto Ramirez case.

Tr."). Officer Michael Greaney, the "first officer" on the scene, testified that he had searched the street and sidewalk for ballistics evidence before the crime scene detectives arrived, but also found nothing. (Hr'g Tr. 84-85). Furthermore, Officer Greaney stated that he did not receive any ballistics evidence from the crime scene detectives for vouchering. (Hr'g Tr. 86-87). Detective Kevin Barry testified that he performed a computer search for ballistics records associated with the Luis Pagan complaint number, and that his search yielded no results. (Hr'g Tr. 29-30).

Detective Marrero, whose signature appears on the ballistics comparison request, testified that he did not remember making the request. (Hr'g Tr. 13-14). He also testified that he was working on 58 potentially connected murders and attempted murders at the time the request was made, which included the Jamie David case and the Luis Pagan case. (Hr'g Tr. 4-5, 12-13). Detective Marrero was not asked whether he had worked on the Alberto Ramirez case.

Detective Anthony Tota, who performed the requested ballistics comparison, explained the significance of two additional documents produced by the State at the evidentiary hearing, each of which recorded the receipt of ballistics evidence from a crime scene. The first, People's 3, recorded the receipt of two .380 caliber bullets from the medical examiner's office and four .380 caliber

bullets from the scene of the Alberto Ramirez homicide.[5] (Magri Aff. at Ex. 16; Hr'g Tr. 70). That inventory sheet contained two complaint numbers, 2662 and 2762, and two ballistics numbers, 4698 and 4902. (Magri Aff. at Ex. 16; Hr'g Tr. 71-72).

Detective Tota also testified as to the contents of People's 4, the inventory sheet for the Jamie David murder. That document contained the name "Jamie Davies" and recorded the receipt of two pieces of ballistics evidence, one from the medical examiner and one from the scene. (Hr'g Tr. 72). The ballistics number listed on People's 4 was 8941, and the complaint number was 6151. (Hr'g Tr. 72-73). The request made by Detective Marrero was for a comparison between ballistics numbers 8941/95 and 4698/94 –– in other words, between the ballistics evidence associated with the Jamie David murder and the ballistics evidence associated with the Alberto Ramirez murder. (Magri Aff. at Ex. 14). Although the words "Victim, Luis Pagan" appear next to the ballistics number 4698/94 on the request, the complaint number listed is 2762/041, one of the two complaint numbers associated with the Alberto Ramirez homicide. (Hr'g Tr. 12, 70). Detective Peter Tarsnane testified that the complaint number associated with the Luis Pagan murder was 5821, a

_____

[5]The victim was listed as "unknown" when the inventory sheet was completed but was later determined to be Alberto Ramirez. (See Hr'g Tr. 70).

30

number that does not appear on either suppressed ballistics document. (Hr'g Tr. 18; Magri Aff. at Exs. 14, 15).

The prosecutor argued in closing that the appearance of the name "Luis Pagan" on the ballistics request was merely a clerical error, based on testimony that the numbers accompanying that name corresponded with the Alberto Ramirez homicide, that shell casings were recovered from the Ramirez homicide, and that no ballistics evidence was recovered from the Luis Pagan crime scene. (Hr'g Tr. 128-32).

2. <u>Assessment of the State Court's Materiality Analysis</u>

Based on this evidentiary record, the state court found that "[t]he deceased was mistakenly listed as Luis Pagan" on the undisclosed ballistics comparison request and that in fact "there was no ballistics evidence seized in the Luis Pagan case." (Magri Aff. at Ex. 24, p. 18). The court further concluded that the ballistics documents "would at best, have served as additional impeachment material, that the People could have rebutted[.]" (<u>Id.</u>).

Petitioner argues now, as he did in his 440.10 motion, that the evidence proffered at the 440.10 hearing by no means negates the possibility that the jury could have interpreted the significance of the ballistics documents differently. He asserts that the jury could reasonably have concluded that the comparison request did reference ballistics actually recovered from the scene of the Luis Pagan murder, based on 1) the appearance of Mr. Pagan's name on the comparison request, 2) the testimony of the requesting detective that he was working on both the Pagan case and the David case at that time of the request, 3) the fact that the request was made in 1997, which coincides with the time period in which Stroud and Rodriguez were cooperating with the federal government (suggesting that the request was made because petitioner had become a suspect in both crimes),[6] 4) the reference to a purported gunshot wound on various medical records and Pagan's death certificate, and 5) testimony that the police initially believed Pagan to have been shot in the face. (See Pet'r's Reply Mem. of Law at 1; Saxon Reply Mem. of Law at 14-19). Such a conclusion would be consistent with the defense theory that Mr. Pagan had been shot, and that the prosecution had presented false testimony at trial that Pagan had been beaten to death by petitioner and Saxon.

---

[6]However, Rodriguez testified that he had pled guilty in federal court on January 9, 1996 after several proffer sessions. (Tr. 825-826). Stroud began meeting with federal prosecutors sometime in the summer of 1996 and signed a cooperation agreement on December 27, 1996. (Id. at 613-15).

When evidence could be interpreted by the jury as exculpatory, it is favorable for <u>Brady</u> purposes. <u>See</u> <u>Kyles</u>, 514 U.S. 419, 448-49 ("While the jury might have understood that Beanie meant simply that if the police investigated Kyles, they would probably find the murder weapon, the jury could also have taken Beanie to have been making the more sinister suggestion that the police "set up" Kyles, and the defense could have argued that the police accepted the invitation"); <u>United States v. Rivas</u>, 377 F.3d 195, 199-200 (2d Cir. 2004)(vacating a judgment of conviction on <u>Brady</u> grounds based on suppression of a statement that could reasonably have been viewed as either inculpatory or exculpatory by the jury). However, the ability of the prosecution to effectively rebut defense evidence should also be taken into account in assessing the potential impact of withheld evidence on a jury's verdict. <u>See</u> <u>Kyles</u>, 514 U.S. at 450 (finding that a list of cars in the parking lot where crime took place was favorable and had some weight even though the police would have testified that it was incomplete).

In this case, to conclude that ballistics actually were recovered from the Pagan crime scene, the jury would have had to reject as incredible the testimony of several police officers that no such ballistics evidence was recovered. We defer to the state court's finding that the State's witnesses testified credibly in this respect. Their credibility was fortified by the absence of any

evidence that the police had recovered ballistics evidence at the scene other than the suppressed ballistics documents that are the subjects of this claim, and by the consistent testimony of the eyewitnesses that Pagan had been beaten, not shot.

Consequently, the state court was plainly justified in finding that the prosecution would have presented credible testimony at trial to show that the appearance of Mr. Pagan's name on the ballistics comparison request was a clerical mistake. Viewed in that light, the ballistics comparison request has little significance as impeachment evidence. The results of the comparison have none, since they showed no match between the two sets of ballistics compared, neither of which originated from the Luis Pagan crime scene.

B. <u>The Grand-Jury Transcripts</u>

Petitioner also claims that his rights under <u>Brady</u> were violated by the prosecution's suppression of two grand-jury transcripts from the Jamie David case -- Marqueo Stroud's October 27, 1999 testimony and portions of Arnold Rodriguez's October 21, 1999 testimony. We begin our analysis by reviewing the contents of those transcripts and the testimony of Rodriguez and Stroud in the Pagan trial.

1. <u>Arnold Rodriguez's Jamie David Grand Jury Testimony</u>

Arnold Rodriguez testified in front of the grand jury that he had known Carter for several years prior to the David murder, and that he saw him every day at the corner of 163rd Street and Kelly Street. (Saxon Pet. at Ex. C, p. 5). He stated that he had known Saxon for a few months, and that he also saw Saxon every day during the summer of 1995. (<u>Id.</u> at 6). Rodriguez said that on August 11th, 1995 he was in front of Peppino's Bar, at 163rd Street and Kelly Street, with a group of people, including petitioner, Saxon, and Marqueo Stroud. (<u>Id.</u> at 7). According to Rodriguez, while standing near Carter and Saxon, Stroud told him that "Macho," the owner of a neighborhood clothing store, had "put a hit on someone" who had attempted to rob his mother's house. (<u>Id.</u> at 7-9). Then, Rodriguez got into Marqueo Stroud's BMW, along with an individual named Jason, and Saxon got into Carter's vehicle along with Lamont Beazer and an individual known as "Little Preem." (<u>Id.</u> at 9).

As Rodriguez recounted the events to the grand jury, Stroud and petitioner drove to a nearby store, which Stroud, petitioner, and Beazer entered. When the three emerged, Beazer had a gun and a mountain bike and said he was going to "do it." (<u>Id.</u> at 11). At that point, according to Rodriguez, Saxon returned to Carter's car,

along with Little Preem, and the others got into Stroud's BMW. "Saxon was in the front passenger seat and Preem got into the back." (Id. at 12). The two vehicles, along with Lamont Beazer on the bicycle, caravaned to the clothing store owned by "Macho," at which point "[Petitioner] said we should snatch him up because he has a lot of jewelry. And [Saxon] followed by saying we should kidnap him, rob him for the jewelry, and then kill him." (Id. at 14-15). Stroud responded, "I don't care, you all do what you have to do, I'm leaving." A few blocks later, Stroud's vehicle, with petitioner's vehicle behind it, pulled up next to a car at a stoplight. While Stroud made casual conversation with the driver, Lamont Beazer rode up on his bicycle and shot Jamie David, who was sitting in the back, in the head. (Id. at 16-18).

In connection with the Pagan murder trial, the prosecutor turned over to the defense seven of the twenty-nine pages of Arnold Rodriguez's grand jury testimony from the Jamie David case. (Saxon Pet. at Ex. D). All of Rodriguez's testimony concerning Saxon's and petitioner's alleged participation in the David murder was redacted, leaving only his statement that he had known petitioner for several years, that he saw him every day during the summer of 1995, and that petitioner was present for a conversation between Stroud and Rodriguez. (See Id.). Although the redacted transcript contains a question that suggests the conversation had to do with

Macho's "problem with a "guy who robbed him or attempted to rob him," the relevant portion of the answer is redacted. (Id. at 22). A portion of the transcript in which Rodriguez stated that he had identified Carter and Beazer in separate procedures on October 1, 1996, and Saxon on October 21, 1999, was crossed out but legible. (Id.).

### 2. Arnold Rodriguez's Trial Testimony

Arnold Rodriguez testified in the Luis Pagan murder trial on October 27th, November 3rd and November 4th of 1999. The vast majority of Rodriguez's testimony concerned his own lengthy criminal history. (Tr. 815-25, 830-55, 1053-62, 1067-72, 1079-97, 1102-46, 1204-13, 1216-22-F, 1226-29, 1242-44). He identified petitioner, and testified that sometime in the summer of 1995, he was standing in front of Peppino's Bar (across from Kelly Grocery) with Saxon, petitioner, and Stroud. A crack addict approached petitioner and asked him for something, and petitioner said "get the fuck out of here before I beat you down like the last motherfucker I beat down, like, you know, beat to death...I killed him. I beat him to death." (Tr. 861-63). According to Rodriguez, Saxon heard this statement and said nothing. (Id. at 863). Later, Rodriguez asked petitioner what he had been talking about, and petitioner explained that he had "picked a Herb by the store,

37

and...he beat the guy up and the guy eventually died," and that he did so "to catch rec." (Id. at 864). Rodriguez explained that an "Herb" is somebody innocent who is an easy target, and to "catch rec" means "[j]ust for the hell of it." (Id.).

Rodriguez also testified to an incident in which a gray Mustang had pulled up very close to him and Carter while they were drinking beer on the corner of 163rd Street and Kelly Street. According to Rodriguez, the driver made eye contact with Carter, and Carter said "I got beef with him because I killed somebody in his family." (Id. at 865).[7]

### 3. Marqueo Stroud's Jamie David Grand Jury Testimony

Marqueo Stroud also testified before the grand jury concerning the August 11th, 1995 murder of Jamie David. He testified that after Macho had asked him to murder Jamie David, he told petitioner about Macho's request, and petitioner enlisted Lamont Beazer to commit the murder. (Saxon Pet. Ex. E at 10). Stroud further testified that he had charged Macho three thousand dollars to arrange the murder, half of which went to Beazer, and the remaining half of which was split between himself and petitioner, and that petitioner kept the

---

[7]Luis Pagan's son testified that between October of 1994 and May of 1997, he and his cousin drove around in a gray Mustang every day. (Tr. 88-89). He also identified petitioner in court. (Id. at 89-90).

murder weapon. (Id. at 11, 15-16). His account of the murder itself is substantially the same as Rodriguez's, but contains less testimony as to Saxon's involvement. Stroud's testimony concerning Saxon consisted only of statements that he had known Saxon since he was seventeen years old, that when he returned to Kelly Street after the murder, the people with him were "Chino, Jason, L B, [Saxon] and...the rest of the crew," and that he had positively identified Saxon on October 21, 1996. (Id. at 8, 15, 17).

The record does not contain a redacted version of Stroud's grand-jury testimony; however, respondent does not dispute Carter's assertion that the portions of both transcripts in which Rodriguez and Stroud accused Saxon of being present at the murder of Jamie David were not turned over to the defense. (Pet'r's Reply Mem. of Law at 1, Saxon Mem. of Law at 2-4).

### 4. Marqueo Stroud's Trial Testimony

Marqueo Stroud's testimony at the Luis Pagan murder trial, like Rodriguez's, consisted mainly of a recitation of his own crimes. Like Rodriguez, Stroud also testified as a witness to Carter's admissions of guilt, not as an eyewitness to the crime. He testified that he and petitioner were "like brothers" (Tr. 617), and that he was close friends with Saxon as well, whom he had known

for more than twelve years. (Tr. 621). Stroud identified both petitioner and Saxon in court, and stated that "when [Saxon] did start coming back around, [petitioner] would come back in town, [Saxon] would be with him." (Tr. 622-23).

Stroud described two conversations in which petitioner confessed to him that he had murdered Pagan. On the first occasion, Stroud approached petitioner with an "idea...about the situation on Kelly Street," to which petitioner responded, "[Y]eah, you know...that's a good idea because I can't be around here now because of the old man I killed across the street by the store...I think the DT's is looking for me for that...that's why I'm staying out in PA."[8] Petitioner also stated that he was concerned about a "guy that was coming around in a gray Mustang[,]" who he thought was related to Pagan. (Tr. 624-25).

Later that week, Stroud had another conversation with petitioner in which Carter said, "you ain't gotta worry about them...all them niggers are scared of me...those niggers know what's happening. I killed that old man across the street with my [bare] hands. They know I have it." (Id. at 627). Stroud asked petitioner how he had killed someone with his bare hands, and

---

[8]According to Stroud, by "DT's" Carter meant detectives, and by "PA" he meant Pennsylvania. (Tr. 624-25).

petitioner explained that he had bashed him in the head with a bottle, stomped on him, and rammed his head into a security gate, acting out the events while relating them to Stroud. (<u>Id.</u> at 627-28). Finally, Stroud testified that every time petitioner saw a detective car or the gray Mustang, he hid. (<u>Id.</u> at 629).

5. <u>Assessment of the State Court's Brady Ruling</u>

Although the state court did not explicitly analyze whether the transcripts met the first two elements of a <u>Brady</u> claim -- favorableness and suppression -- respondent urges us to find that the grand-jury transcripts were not suppressed. He then argues that in any event the state court's finding of lack of materiality was fully justified. We reject respondent's first argument and hold that the transcripts were indeed suppressed, but conclude that the state-court finding of no materiality does not reflect an unreasonable application of Supreme Court precedent.

(a) <u>Suppression</u>

The prosecutor has an affirmative duty under <u>Brady</u> and its progeny to disclose favorable evidence known to it, even in the absence of a specific request by the defense. <u>E.g.</u>, <u>Kyles</u>, 514 U.S. at 419, 432-433, 437-38; <u>Payne</u>, 63 F.3d at 1208. There is no

dispute in this case that the prosecutor had the grand-jury transcripts in her possession, nor is there disagreement that any transcripts disclosed to the defense were redacted in a manner that eliminated all of Stroud's and Rodriguez's testimony concerning Saxon's and petitioner's alleged involvement in the Jamie David murder.[9]

However, as respondent reminds us, "'[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted)). Respondent argues that Carter was aware of such essential facts as would have permitted him to infer that Stroud and Rodriguez had falsely accused Saxon of being present at the Jamie David murder in their grand jury testimony. Having so inferred, respondent suggests, petitioner could have moved the court to subpoena the grand-jury transcripts, which are secret under New York law, N.Y. Crim. Proc. Law § 190.25(4)(a), and

---

[9]In our independent examination of the trial record, we find no clear explanation from the prosecutor for the redactions, and respondent asserts only that the transcripts were "inadvertently held." (Resp't's Mem. of Law at 39). We note, however, that the issue of whether or not the prosecutor can fairly be charged with the knowledge, at the time of the Pagan trial, that Stroud and Rodriguez had lied in their testimony (thus making the grand-jury transcripts Brady material) could potentially affect our analysis. However, since respondent does not raise that question, we do not address it.

review them under seal. (Resp't's Mem. of Law at 34-38). Specifically, respondent argues that because A.D.A. Florio informed petitioner's trial counsel and Saxon's trial counsel that they were the subjects of a grand jury presentation and offered them the opportunity to testify before the grand jury, and because the redacted transcript of Rodriguez's testimony mentioned the date August 11th, 1995, petitioner should have known that he and Saxon were being accused of involvement in the murder of Jamie David. (Id. at 34-36). Additionally, according to respondent, petitioner should have been aware that the grand-jury presentation was about the David murder because of Marqueo Stroud's explanation of his own involvement in the murder during his lengthy recitation of his criminal history at the Pagan trial. (Id. at 35).

This argument presumes that petitioner participated in the David murder, or at least that he knew the exact date on which David had been murdered and remembered it more than four years later, when he was tried for the Pagan murder. Otherwise, August 11th, 1995 would have no particular significance for him. Although there is no evidence that Stroud and Rodriguez testified falsely as to Carter's involvement, the charges against him were dropped, and we cannot assume that he is guilty of a crime for which he was never tried.

Even if Stroud's and Rodriguez's grand-jury testimony was accurate as to Carter's involvement in the David murder, Carter had no reason to assume that the unknown crime for which he was being indicted was the Jamie David murder. Carter would not have expected to be indicted together with Saxon for that crime, since Saxon was incarcerated at the Groveland Correctional Facility in Sonyea, New York on the date of the David murder. (Pet'r's Reply Mem. of Law at 1; Saxon Mem. of Law at 26; Saxon Pet. Ex. F). Furthermore, it was not apparent from the redacted transcript of Rodriguez's testimony that the prosecutor turned over to petitioner's attorney that the grand jury proceeding had pertained to a crime committed on August 11, 1995. The redacted version of the transcript contains only one mention of August 11, 1995: "Q: And now Mr. Rodriguez, I want to take you back to the date of August 11th, of 1995. Did you have a conversation with Marqueo[.]" At that point the transcript is redacted mid-sentence and continues to a portion of Rodriguez's discussion of his cooperation agreement. (Saxon Pet. Ex. D). At the end of the transcript, he is asked about a conversation between him and Stroud concerning a problem that a neighborhood storeowner named Macho had had with someone who had robbed or attempted to rob him, but Rodriguez's answer is cut off. (Id.). The pages turned over to defense counsel contain a half page that was crossed out but still legible in which two other dates are mentioned -- October 1, 1996, when Rodriguez identified Beazer and Carter, and October

21, 1999, when he identified Saxon. (<u>Id.</u>). There is no explanation of what crime or crimes those identification procedures pertained to.

We reject respondent's suggestion that petitioner should have gleaned from the redacted transcript that he and Saxon had been indicted for the Jamie David murder. Thus, we conclude that petitioner was not "on notice of the essential facts permitting him to take advantage of any exculpatory evidence" during his trial.[10] <u>Leka</u>, 257 F.3d at 100 (quoting <u>LeRoy</u>, 687 F.2d at 618 (citations omitted)). The grand-jury transcripts were suppressed.

### (b) <u>Assessment of the State Court's Materiality Analysis</u>

The state court concluded that the grand-jury transcripts, though favorable to petitioner, would only have provided cumulative impeachment material to use against non-essential witnesses. Characterizing the other evidence against petitioner as "overwhelming," the state court concluded that since "the criminal backgrounds of the people's 'cooperating' witnesses were meticulously and vigorously explored before the jury," the

_____

[10]We also note that in considering petitioner's newly-discovered-evidence claim, the state court found that petitioner had shown that the same documents "could not have been produced by the defendant at trial even with due diligence on their part[.]" (Magri Aff. at Ex. 24, p. at 25).

45

revelation of Stroud's grand-jury testimony would "at best have reinforced that which was already presented to the jury, namely that he was a self-serving[] opportunist, and a liar." (Magri Aff. at Ex. 24, p. at 19-20, 24). As for Rodriguez, the court concluded that "confronting him with the Grand Jury testimony would merely have reinforced his already blemished and questionable character." (Id. at 22).

Carter argues that the transcripts are material not only as to his co-defendant Saxon, but also as to him, since they show that Stroud and Rodriguez were willing to falsely accuse someone of committing murder even after signing cooperation agreements with the Government. (Pet'r's Reply Mem. of Law at 5, 7-12). He also contends that this impeachment evidence would have been of a different quality from generalized "bad acts" evidence, and thus would not have been cumulative. Finally, petitioner argues that the disclosure of the grand-jury transcripts would, by extension, have destroyed the credibility of all of the cooperating witnesses because it would have illustrated that cooperation agreements are not a guarantee of truthfulness. (Id. at 12-13).

Petitioner's argument as to the difference in the quality of impeachment evidence between Stroud's and Rodriguez's trial recitations of their own criminal histories and the impeachment

material from the grand-jury transcripts has some force.  Indeed,
as petitioner points out, the grand-jury transcripts would not only
illustrate that Rodriguez's and Stroud's honesty was not ensured by
the cooperation agreements, but also that both of them were willing
to falsely accuse somebody of committing a murder.  Additionally,
the defense could have suggested, based on the fact that both
Stroud and Rodriguez placed Saxon and petitioner at the scene of
the Jamie David murder, that the Kelly Boys, or the Bryant Boys and
the Kelly Boys together, were conspiring to frame petitioner and
Saxon.

     We cannot conclude, however, that the state court's rejection
of petitioner's arguments represented an unreasonable application
of established Supreme Court precedent. Although the grand-jury
transcripts clearly would have further undermined the credibility
of Stroud and Rodriguez, given their extensive criminal histories,
to which both testified, it was reasonable for the court to
characterize the additional impeachment evidence that they would
have provided as cumulative. Additionally, there were four
eyewitnesses who identified petitioner as one of the perpetrators,
and an additional witness, Jose Feliciano, who testified that
petitioner had confessed to him that he had murdered Pagan. See,
e.g. United States v. Orena, 145 F.3d 551, 558 (2d Cir. 1998) ("the
existence of substantial independent evidence of guilt is

unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question").

When a single witness supplies the only evidence linking a defendant to a crime or establishes an essential element of the crime, suppressed impeaching evidence may be particularly material. See, e.g., Giglio, 405 U.S. at 154-55; United States v. Badalamente, 507 F.2d 12, 16-18 (2d Cir. 1974). However, in general, "'where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" Shabazz, 336 F.3d at 166 (quoting United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998)). The state court based its conclusion that the undisclosed grand-jury transcripts were cumulative on the fact that both Stroud and Rodriguez had recited their extensive criminal histories on direct and cross examination at trial, and that both had disclosed that they were facing life terms in federal prison if they did not cooperate with the federal government. (Magri Aff. at Ex. 24, p. at 19-22). Indeed, petitioner's trial counsel used that information to argue in closing that they were inventing their testimony to curry favor with the federal government and obtain sentence reductions. (Tr. 1575-76). Furthermore, the state court

noted that the case against petitioner did not depend on the credibility of their testimony. (Magri Aff. at Ex. 24, p. at 22-23).

Stroud and Rodriguez both provided the defense with extensive impeachment material at trial. Stroud testified that after short stints selling drugs as a teenager, he became a full-time drug dealer in 1989 or 1990, when he started working with Arnold Rodriguez and the Bryant Boys selling crack and heroin on Bryant Avenue in the Bronx. (Id. at 579). After being promoted from lookout to pitcher/manager,[11] Stroud started his own drug organization and began selling crack at a different location. (Id. at 579-81). In the summer of 1995, he "opened up" on Kelly Street. (Id. at 584). Stroud was "boss" of his group's drug sale location at the corner of 163rd Street and Kelly Street. (Id. at 586). During that time period, Stroud bought crack on one occasion from Jose Feliciano, a Kelly Boys member who had a drug sales location in front of Kelly Grocery. (Id. at 587- 588). Stroud also sometimes "cooked up" crack for the Kelly Boys -- that is, created crack from a cocaine base by mixing it with baking soda. (Id. at 588-89).

As Stroud recounted it, he was arrested on October 31st of 1995 and has remained incarcerated since. (Id. at 584). In 1997 he pled

---

[11]A "pitcher" is one who conducts hand-to-hand drug sales in public, while a "manager" supervises pitchers. (Tr. 580).

guilty to conspiracy to distribute cocaine and heroin with the Bryant Boys in Hunt's Point, conspiracy to murder Kevin Lyons, supplying drugs to and directing the activities of the Stroud Organization, "supervising a drug location" for a group named "25 to Life" at 163rd Street and Kelly Street, "participating in" the murder of Jamie David and perjury. The perjury involved signing an affidavit in which he falsely stated that he had not been Mirandized, with the affidavit having been submitted to a court in connection with a motion to suppress. (Id. at 589-94, 605-07). Facing three life terms, Stroud decided to cooperate with the federal government. (Id. at 612).

Arnold Rodriguez's testimony as to his criminal activities was even more disturbing. Rodriguez recited that he had started in the drug business as a teenager, helping his father package cocaine in glassine bags. (Id. at 815-16). As a teenager, he also sold drugs on Bryant Avenue, eventually becoming a manager. (Id. 818-19). In 1987, he joined the Ocasio-Carillo drug operation. (Id. at 820).

In 1996, Rodriguez pled guilty to racketeering in connection with his activities with the Bryant Boys, as well as to personally murdering Donnell Broady, conspiring to murder Zolio Pabellon,[12]

---

[12]Rodriguez was the driver; Pabellon and his wife were both shot while walking arm in arm down the street in a contract murder. (Tr. 838-39).

committing attempted murder of a member of the Nasty Boys, murdering his "best friend" Manny Burgos over a turf dispute, conspiring to murder Xavier Carillo, Julio Carillo, and Lenny Rivera, conspiring to murder Kelvin Lyons and Joseph Hendrickson, committing attempted murder of Kelvin Lyons (an incident in which a bystander was killed by accident), committing attempted murder of several unidentified men (in which Rodriguez fired a gun into a car with people in it), and murdering Axel Antonetti. (Id. at 833-856). As the state court noted, "Rodriguez' character was poignantly portrayed to the jury when it was revealed that he preferred to beat people with wooden axe handles... 'because a wooden bat, it could break, it could splinter up. An axe handle, it's hard to break it.'" (Magri Aff. at Ex. 24, p. at 21-22; Tr. 1053). Rodriguez also testified on cross-examination to a series of crimes that he had committed but for which he was not prosecuted, including beating several people with axe handles, robbing a car wash and setting fire to the cars, stabbing an "older man," and setting fire to Manuel Burgos' mother's apartment (Tr. 1055-59).

Rodriguez also revealed on cross-examination that he had lied to his probation officer, fabricating a letter that purported to confirm his employment when in fact he was selling drugs. (Id. at 1085-86). He also admitted that he had lied to a judge in Bronx County in 1990 when he pled guilty to possession of a controlled

substance that in fact he had never possessed. (Id. at 1087-90).
Rodriguez further revealed that he had lied to the federal
government in an early proffer session by telling an Assistant
United States Attorney that he was not involved in the murder of
Manny Burgos despite the fact that his agreement stated that he
could be prosecuted for making a false statement at a proffer
meeting.[13] (Id. at 1094-95). Additionally, although his proffer
agreement forbade him to commit any more crimes, he admitted that
he had smoked marijuana while incarcerated at the Metropolitan
Detention Center. (Id. at 1096).

In light of the known violent criminal histories of these two
men and the fact that both admitted to lying under oath, as well as
to lying to law enforcement personnel on other occasions, and
taking into account the fact that Arnold Rodriguez admitted at
trial to having violated the terms of his cooperation agreement
with the federal government, it was certainly not unreasonable for
the state court to characterize the withheld portions of the grand-
jury transcripts as cumulative impeachment evidence.

Petitioner's corollary argument is that because the grand-jury
transcripts would have discredited Marqueo Stroud and Arnold
Rodriguez, they would, by extension, have discredited all of the

---

[13]Rodriguez also stated that he was not in fact prosecuted
for lying at his proffer session. (Tr. 1095-96).

State's cooperating witnesses. Petitioner's argument suggests that the only reason that any of the cooperating witnesses were believed is that their cooperation agreements bound them to tell the truth; thus, he contends that since the impeachment of Stroud and Rodriguez with the grand-jury transcripts would have destroyed the notion that such agreements are effective, all of the cooperating witnesses would have been discredited. In this scenario, the jury would have declined to credit the eyewitness testimony of Stephen Feliciano and Jose Rodriguez, as well as the confession testimony of Jose Feliciano. Left with only the eyewitness testimony of Juan Dume and Elvira Viera, both of whom, according to petitioner, were witnesses of questionable credibility, and substantial evidence that Pagan was shot to death rather than beaten, petitioner suggests that there is a reasonable probability that the jury would have acquitted.

The problem with petitioner's argument is its premise -- that the only reason the jury had to believe the cooperating witnesses was that they were bound to testify truthfully by their cooperation agreements. In fact, the jury had another, more powerful, reason to credit the testimony of the cooperating witnesses -- they corroborated each other, and their testimony was also corroborated by the testimony of Elvira Viera and Juan Dume, who, contrary to petitioner's insinuations, had no apparent reason to lie.

Jose Rodriguez, testifying pursuant to a cooperation agreement, was selling crack in front of Kelly Grocery at the time of the incident. He stated that petitioner and Saxon "jumped the line and went straight to the window and started ordering...the older man told him 'listen, I'm on line. I was here first.' [Petitioner] told him 'get the fuck out of here'... '[t]he man said respect, There's other people on line. At that point [he] told him to get out of his face, and he struck him with a bottle." (Tr. 1331). Jose Rodriguez knew both Carter and Saxon personally and recognized them on the night of the murder. (Id. at 1313-1318, 1321).

Elvira Viera's testimony corroborated this account of how the altercation began. After purchasing two bottles of crack on Simpson Avenue, Viera walked past Kelly Grocery on her way to a friend's house. (Id. at 496-99). When she reached the corner of Kelly Street and 163rd Street, she observed a "White Hispanic" man standing at the window of the bodega with two other people on line behind him. (Id. at 500-501). She testified, "He was ready to buy when the black ones arrived and pushed him away...the two black men came to jump in front of the line. They started to fight, to argue..." (Id. at 501). Viera identified Carter, whom she saw on a weekly basis, but did not identify Saxon. (Id. at 504-06).

Jose Rodriguez and Elvira Viera agreed that the two assailants then repeatedly punched Pagan in the head and face.[14] (Id. at 1334-35, 502-04). Viera continued on her way when the beating began, and Jose Rodriguez left briefly to check his stash of drugs, which was in the tire of a nearby car. (Id. at 512, 1335-36). While checking his stash, Rodriguez heard the noise of "banging" "[l]ike on the store front, the gate." (Id. at 1337). When he returned to Kelly Grocery, Luis Pagan was lying on the ground in front of the Chinese restaurant and petitioner and Saxon were "kicking him and stomping" his head, hard enough that "[h]is head was bouncing off the floor" and his body began shaking "[l]ike he was going into convulsion or something." (Id. at 1338-42).

Juan Dume, the proprietor of the Kelly Grocery, testified that throughout the day preceding the murder he had sold beer to petitioner and Saxon, who were regular customers. (Id. at 899-900). Luis Pagan came into Kelly Grocery right before Dume closed, but said he did not know what to buy and that he was going to look for his wife. (Id. at 909-10). Later, when Dume was counting money at the cash register after closing the store entrance, he heard "the noise of the gate," which was "like when you hit a metal door or something like that." (Id. at 913). He went outside to see what was going on, and recognized petitioner and Saxon each holding Pagan by

---

[14]Viera testified that they also punched his chest. (Tr. 504).

the arm and hitting his head against the gate of the restaurant. (<u>Id.</u> at 913-15). At that point, Pagan's face was covered with blood and he appeared to be unconscious. (<u>Id.</u> at 916). "They left him on the ground dropped, as if he was dead and then left." (<u>Id.</u> at 927).

Stephen Feliciano corroborated Juan Dume's account of petitioner and Saxon ramming Pagan's head into the security gate of the restaurant. Feliciano, who testified pursuant to a cooperation agreement, was selling drugs at 163rd Street and Kelly Street that evening. (<u>Id.</u> at 269). At one point he left with one of his associates to put oil in his associate's car and heard a sound "like a bottle breaking...or like somebody being thrown against the gate" and people screaming. (<u>Id.</u> at 278). He returned to Kelly Grocery and observed Carter and Saxon, both of whom he knew personally, "holding the man and banging -- ramming his head against the gate of the Chinese restaurant." (<u>Id.</u> at 280). After being rammed against the gate three or four times, "the man didn't have no more balance and they threw him on the floor" and began kicking and stomping him over his face and towards the upper part of his body. (<u>Id.</u> at 282-83). Feliciano also testified that Saxon had beaten Mr. Pagan with a cane while the victim lay on the ground. (<u>Id.</u> at 283). After the beating, when Mr. Pagan was motionless, "[t]hey crossed the street like hugging each other and

slapping each over five and stuff, laughing, like it was funny."
(Id. at 287).

Since the eyewitnesses corroborated each other in the particulars of the crime, such as how it began, how Pagan was rammed against the security gate, and where petitioner's and Saxon's blows fell on Pagan's body, and all four of them identified petitioner as one of the perpetrators, we concur with the trial court that the further impeachment of Marqueo Stroud and Arnold Rodriguez would not have significantly undermined the credibility of Jose Rodriguez's and Stephen Feliciano's accounts of the incident. The fact that they were testifying pursuant to cooperation agreements -- whether or not such agreements are guarantors of truthfulness -- does not overcome the fact that two civilian witnesses corroborated their testimony. Thus, we cannot conclude that there is a reasonable probability that, had the jurors seen the grand-jury transcripts, they would have rejected most or all of the eyewitness testimony. Additionally, because Jose Rodriguez and Stephen Feliciano were both cross-examined about their own extensive criminal histories and their cooperation agreements, any indirect impeachment value derived from the grand-jury transcripts would have been cumulative as to them.[15]

---

[15]Both Jose Rodriguez and Stephen Feliciano were members of the Kelly Boys. (Tr. 1260, 211). Rodriguez recounted at the Pagan trial that he had become addicted to drugs in the late

In sum, although we agree with petitioner that the quality of

impeachment evidence from the grand-jury transcripts would have

---

1980s and began selling drugs at that time to support his
addiction. (<u>Id.</u> at 1254-59). After a brief stint as a shipping
clerk in a Manhattan factory, Rodriguez, in recovery from his
own addiction, went to work for the Kelly Boys. (<u>Id.</u> at 1259-
60). He began acting as a lookout for the Kelly Boys at 163rd
Street and Kelly Street (<u>Id.</u> at 1262-63), and eventually became
a pitcher, selling heroin in front of Kelly Grocery and,
occasionally, in Albany. (<u>Id.</u> at 1264-65). Rodriguez also
admitted to having acted as a middleman between gun dealers and
the Kelly Boys (<u>Id.</u> at 1313), as well as to lying to a court
(pleading guilty to arson, which he did not commit, to avoid a
statutory rape charge). (<u>Id.</u> at 1288-95, 1414-15). In April of
1999, he was arrested by U.S. Marshals for conspiracy to
distribute narcotics and he began cooperating with the federal
government later that year. (<u>Id.</u> at 1296, 1298-1300).

Stephen Feliciano began working with the Kelly Boys,
packaging crack cocaine in 1991 or 1992. (<u>Id.</u> at 216-17). By
1994, he had been promoted to manager of the block on which
Kelly Grocery is located. (<u>Id.</u> at 234, 240). Feliciano testified
that the Kelly Boys generally kept 15 or 20 guns hidden in the
vicinity of his drug sale location, and that he sometimes
carried a gun. (<u>Id.</u> at 252-53). One of his roles in the Kelly
Boys was to pick up guns that another member of the Kelly Boys
procured and test their functionality. (<u>Id.</u>). Feliciano also
testified that he sold drugs in Pennsylvania for the Kelly Boys.
(<u>Id.</u> at 255). On one occasion, Feliciano told a witness to a
murder who had testified in front of a grand jury to testify at
trial that the Government had made her lie. (<u>Id.</u> at 256-58). On
another occasion, Feliciano instructed his associate Anthony
Urbistando to kill Ramon Pena because Feliciano owed Pena
$1500.00. (<u>Id.</u> at 262-63). After Urbistando killed Pena,
Feliciano helped dispose of the body. (<u>Id.</u> at 263). When he was
arrested by the Drug Enforcement Administration in 1998,
Feliciano was charged with two conspiracies to distribute
narcotics, as well as with conspiring to murder Ramon Pena, and
murdering Ramon Pena. (<u>Id.</u> at 211-12). Facing life in prison,
Feliciano decided to cooperate with the federal government. (<u>Id.</u>
at 212-16).

been somewhat different from the impeachment evidence actually adduced at trial, petitioner's conviction did not depend on the credibility of Stroud or Rodriguez. Compare Giglio, 405 U.S. at 153-54. Furthermore, we reject the notion that the impeachment of Stroud and Rodriguez with the grand-jury transcripts would have discredited the other cooperating witnesses, much less Juan Dume and Elvira Viera.

C. Conclusion as to the Reasonableness of the State Court's Rejection of Petitioner's Brady Claims

Taken together, the grand-jury transcripts and the ballistics documents, if introduced at trial, were not likely to have had a meaningful impact on the case against petitioner. The ballistics documents were almost certainly of minimal significance since the evidence strongly, if not conclusively, reflected that the victim had been beaten to death and not shot, and that the reference to Pagan in the ballistics request was an error. As for the grand-jury transcripts, although the witnesses to Carter's inculpatory statements would have been discredited to a somewhat greater degree than they were by virtue of their own testimony, this additional impeachment would not have added significantly to the already deplorable state of their credibility. Moreover, they were not central to petitioner's conviction in view of the independent and credible corroborating testimony of Ms. Viera and Mr. Dume,

together with the additional consistent testimony of Jose Rodriguez
and Stephen Feliciano. Furthermore, even if the ballistics
documents and the grand-jury transcripts had further undermined the
credibility of the eyewitnesses testifying pursuant to cooperation
agreements, the defense would still have been left with the problem
of the corroborating testimony of Elvira Viera and Juan Dume. The
jury would also have been left with the perplexing question of why
the prosecution witnesses -- if they were all conspiring to frame
petitioner -- would have accused him of beating Pagan to death
rather than shooting him, if in fact he had been shot -- a
particularly strange tactical choice given that the physicians'
notes, police memos, and medical examiner's report all stated that
Pagan had been the victim of a shooting.


We conclude that the state court's <u>Brady</u> decision was not an
unreasonable application of federal law. The court's conclusion,
that there was no reasonable probability that the four documents in
question, if disclosed, would have altered the outcome of the trial
was not objectively unreasonable. Thus, we reject petitioner's
<u>Brady</u> claims as a basis for <u>habeas</u> relief. <u>See</u> 28 U.S.C. §
2254(d)(1); <u>Bagley</u>, 487 U.S. at 682 (explaining <u>Brady</u> materiality
analysis).


III. <u>Legal Insufficiency Claim</u>

In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court held that a conviction is based on legally sufficient evidence if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Petitioner's legal-insufficiency claim relies on a 2004 decision by the New York Court of Appeals, People v. Payne, 3 N.Y. 3d 266, 786 N.Y.S. 2d 116 (2004), which redefined the elements of depraved-indifference murder under New York law. He argues that under the reasoning of Payne, no rational trier of fact could have found the elements of depraved-indifference murder beyond a reasonable doubt because the evidence presented by the prosecution supported only a finding of intentional murder. (Pet ¶¶ 15-17; Pet'r's Reply Mem. of Law at 1; Saxon Reply Mem. of Law at 46-50).

Respondent argues first that this claim is procedurally barred, and, second, that it is meritless. We address each ground in turn.

A. Independent and Adequate State-Law Grounds

A federal court exercising its habeas powers may review state-court judgments that effectively dispose of federal-law claims asserted by convicted criminal defendants. See generally Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)(emphasizing that habeas review is limited to claims based on violations of federal law). With limited exceptions, however, we may not review a state court judgment that "'rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision.'" Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) (quoting Harris v. Reed, 489 U.S. 255, 250 (1989)). Respondent contends that our review of Carter's evidentiary-sufficiency claim is barred by this limitation. Specifically, he argues that the state court ruled that because petitioner had failed to raise his legal-insufficiency claim in his direct appeal, he was procedurally barred from raising it in his collateral challenge under N.Y. Crim. Proc. Law § 440.10(2)(c), and hence that habeas review of the claim is also barred. (Resp't's Mem. of Law at 64-68).

New York law requires a state court to deny a section 440.10 motion if the defendant unjustifiably failed to argue the underlying claim in his or her direct appeal despite having a sufficient record on which to have done so. See, e.g., Sweet v. Bennett, 353 F.3d 135, 139 (2d Cir. 2003) This rule, codified as

N.Y. Crim. Proc. Law § 440.10(2)(c), exists "'to prevent 440.10 from being employed as a substitute for direct appeal when [the] defendant was in a position to raise an issue on appeal...or could have readily raised it on appeal but failed to do so.'" Id. (quoting People v. Cooks, 67 N.Y.2d 100, 103, 500 N.Y.S. 2d 503, 505 (1986)). In opposition to Carter's 440.10 motion, the State argued that his legal-insufficiency claim amounted to "nothing more than a record based challenge to the legal sufficiency of the evidence that could have been, but was not, argued on direct appeal[.]" (Magri Aff. at Ex. 20, p. 5).

To support his contention that the state court adopted that argument and ruled that petitioner's legal-insufficiency claim was procedurally barred, respondent cites only the following sentence from the trial court's decision:

> Notwithstanding this Court's determination that both counts of murder in the second degree were properly submitted to the jury, and that the jury's verdict was supported by legally sufficient evidence, the Court notes, as argued by the People, that the instant claim could have and should have been raised during the direct appeal.

(Magri Aff. at Ex. 24, pp. 38-39). Since federal courts have held that section 440.10(2)(c) is an independent and adequate state-law ground, see, e.g., Sweet, 353 F.2d at 140; Aparicio v. Artuz, 269 F.3d 78, 91 (2001), respondent argues that we should consider petitioner's legal-insufficiency claim procedurally defaulted.

Moreover, since a habeas petitioner can avoid procedural default only by "showing cause for the default and prejudice, or that failure to consider the claim will result in a miscarriage of justice," Sweet, 353 F.2d at 141, and petitioner does not attempt to make such a showing, respondent argues that his legal-insufficiency claim should be dismissed. (Resp't's Mem. of Law at 68).

Although respondent is correct that section 440.10(2) would be an independent and adequate state-law ground that precludes habeas review, we conclude upon close examination of the state trial court's opinion that it did not rest its judgment on that ground. In assessing on habeas review whether a claim is procedurally barred, a federal court should classify the state court's decision as either "(1) fairly appearing to rest primarily on federal law or to be interwoven with federal law or (2) fairly appearing to rest primarily on state procedural law." Jimenez, 458 F.3d at 145. If the decision falls into the first category, it is deemed to be "on the merits" of the federal claim unless the opinion contains "a clear statement of reliance on a state procedural bar." Id.

To determine the primary basis of the state court's judgment, the reviewing court should look to three "clues" -- "(1) the face of the state court opinion, (2) whether the state court was aware

of a procedural bar, and (3) the practice of state courts in similar circumstances." Id. at n.16. In this case, although the state court was clearly aware of the potential procedural bar since that issue was briefed by the State, it appears to have rested its judgment on the merits. Thus, we need not investigate the practice of state courts in similar circumstances to ascertain the basis for the state court's decision.

In its opinion, the state court first undertook a lengthy analysis of the merits of Carter's evidentiary-insufficiency claim –- a discussion extending over thirteen pages –- and it explicitly concluded that the claim was substantively without merit. Only then did it say, in the one sentence cited by respondent, that Carter should have asserted the claim on direct appeal. Moreover, even though it made that observation, it did not further indicate that it was relying on that failing in rejecting the claim. We conclude that the basis of the state-court judgment was not a procedural bar.

The state court's analysis included a review of several New York Court of Appeals decisions that address the meaning of depraved-indifference murder. (Magri Aff. at Ex. 24, pp. 27-40). Applying state law to the facts of this case, the court found that "this was an instantaneous, impulsive beating," that "the evidence

was legally sufficient to support the jury's determination that in beating the victim, the defendants committed depraved indifference murder, not intentional murder[,]" and that "this case...represents a situation where both counts of murder were equally supported by the evidence[.]" (Magri Aff. at Ex. 24, pp. 37-38). Finally, the state court expressly denied the claim on the merits, stating that "the jury's verdict convicting the defendants [of] depraved indifference murder was based upon legally sufficient evidence. Accordingly, defendants' respective motions to set aside the convictions are denied in their entirety." (Magri Aff. at Ex. 24, p. 40).

Although the court need not use "specific talismanic phrases when ruling in the alternative[,]" Glenn v. Bartlett, 98 F.3d 721, 725 (2d Cir. 1996), it must make clear that it is invoking a procedural-waiver ground. Jimenez, 458 F.3d at 145. This did not occur here. We read the sentence on which respondent relies –- a sentence not followed by any indication that the court was relying on that ground –- as merely a "passing reference" rather than as an "independent basis or decision[.]" Fama v. Comm'r of Corr. Services, 235 F.3d 804, 809 (2d Cir. 2000) (citing Coleman v. Thompson, 501 U.S. 722, 732 (1991)). Moreover, this inference gains strength from the fact that Payne, the case relied on by Carter,

was decided in 2004, long after the 2002 decision in Carter's direct appeal.

Having thus determined that the state court's denial of petitioner's claim of legal insufficiency fairly appears to rest primarily on federal law, and that the state-court opinion does not contain a "clear statement of reliance on a state procedural bar[,]" we find that it was "on the merits[,]" rendering it subject to habeas review. Jimenez, 458 F.3d at 145. Accordingly, we turn to the merits of the claim.

B. Standard of Review Under the Habeas Statute

Under 28 U.S.C. § 2254(d), if the state-court decision under challenge rested on the merits of the claim, our habeas review is limited to whether that decision was contrary to, or an unreasonable application of, Supreme Court precedent, or rested on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2). In this case, since the 440.10 court rejected the insufficiency claim on the merits, those limited-review provisions apply. See, e.g., Jimenez, 458 F.3d at 146.

C. <u>Assessment of the State Court's Rejection of Petitioner's</u>
   <u>Legal-Insufficiency Claim</u>

"When it considers the sufficiency of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" <u>Fama</u>, 235 F.3d at 811 (citing <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999). The relevant state law is that which was in effect when petitioner's conviction became final. <u>See</u> <u>Fiore v. White</u>, 531 U.S. 225, 226-229 (2001). In this case, the elements of depraved-indifference murder were altered by the New York Court of Appeals in <u>People v. Payne</u>, five years after petitioner's conviction and nearly two years after his conviction became final. <u>See</u> <u>generally</u> <u>People v. Baptiste</u>, 2008 WL 795099, 2008 N.Y. Slip Op. 02698 (3d Dep't March 27, 2008). When petitioner filed his petition for a writ of <u>habeas</u> <u>corpus</u> on November 29, 2006, the New York Court of Appeals had held less than a month earlier, in <u>Policano v. Herbert</u>, 7 N.Y.3d 588, 825 N.Y.S. 2d 678 (2006) that <u>Payne</u> does not apply retroactively. <u>Id.</u> at 602-03, 825 N.Y.S. at 688-80. Petitioner focuses, however, on <u>Policano</u>'s affirmation that "it has never been permissible in New York for a jury to convict a defendant of depraved indifference murder where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim." <u>Policano</u>, 7 N.Y.3d at 600, 825 N.Y.S. 2d at 687.

Because Payne is not retroactive, Policano, 7 N.Y.3d at 602-03, 825 N.Y.S. at 688-80, petitioner's conviction was legally insufficient only if no rational trier of fact could have found him guilty of all of the elements of depraved-indifference murder under the Court of Appeals' interpretation of the relevant statute in 2002, when petitioner's conviction became final.[16]

---

[16]There is some question as to whether a habeas court faced with a legal-insufficiency claim should consider a petitioner's conviction final when the New York Court of Appeals denies leave to appeal, or when his time to seek certiorari from the United States Supreme Court expires. See Guzman v. Greene, 425 F. Supp. 2d 298, 313 n. 10 (E.D.N.Y. 2006) (declining to reach the issue of whether petitioner's conviction became final for legal-insufficiency analysis purposes when the Court of Appeals denied leave to appeal or when the 90-day certiorari period expired). Although the latter -- in this case October 12, 2002 -- is clearly the date of finality for AEDPA statute-of-limitations purposes, see Sup. Ct. R. 13; Clay v. United States, 537 U.S. 522, 527 (2003), in Policano v. Herbert, 453 F.3d 75 (2d Cir. 2006), the Second Circuit adopted the date of the denial of leave to appeal to the New York Court of Appeals as the date of finality when it certified the following question (and two others) to the New York Court of Appeals: "On March 30, 2001 (the date on which Policano's conviction became final)...would a jury be permitted to find that the elements of depraved indifference murder were satisfied beyond a reasonable doubt?" Id. at 76. March 30, 2001 was the date on which Policano's application for leave to appeal to the New York Court of Appeals was denied. People v. Policano, 96 N.Y.2d 786, 725 N.Y.S. 2d 651 (2001). In its answer to the first certified question, the New York Court of Appeals substituted June 28, 2001 for March 30, 2001, stating that Policano's conviction became final when his time to seek certiorari from the United States Supreme Court expired. Policano, 7 N.Y.3d at 593-95, 825 N.Y.S.2d at 682-83. After the Court of Appeals' decision, the Second Circuit vacated its earlier affirmance of the district court's grant of the writ to Policano, reversing the district court judgment and remanding for entry of an order denying the writ. However, it did not address the Court of Appeals' substitution of June 28, 2001 for the date of finality of Policano's conviction. See generally Policano v. Herbert, 507 F.3d 111 (2d Cir. 2007).

Section 125.25(2) of the New York Penal Law states that a person is guilty of murder in the second degree when, "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person[.]" The relevant New York Court of Appeals cases interpreting the statute at the time that petitioner's conviction became final were People v. Register, 60 N.Y.2d 270, 469 N.Y.S.2d 599 (1983), and People v. Sanchez, 98 N.Y.2d 373, 748 N.Y.S.2d 312 (2002), which affirmed the mode of analysis embodied in Register.

In Register, the Court of Appeals affirmed the defendant's conviction for depraved-indifference murder based on his having shot

---

In Disimone v. Phillips, 461 F.3d 181 (2d Cir. 2006), another case which presented the question of whether a conviction for depraved-indifference murder was based on legally sufficient evidence, a panel of the Second Circuit implied, without analysis or citation, that it considered the relevant date to be the date upon which the petitioner's time to seek certiorari to the United States Supreme Court expired. See id. at 184 (stating that People v. Payne, decided October 19, 2004, was decided 17 months after Disimone's conviction became final -- petitioner was denied leave to appeal by the New York Court of Appeals twenty months earlier on February 3, 2003). We do not, however, need to decide on which date petitioner's conviction became final for legal-insufficiency analysis purposes in order to decide Carter's legal-insufficiency claim since the elements of depraved-indifference murder did not change between July 12, 2002, the date on which Carter was denied leave to appeal to the New York Court of Appeals, and the expiration of his time to seek certiorari ninety days later. See Baptiste, 2008 WL 795099 at 1, 6-7, 2008 N.Y. Slip Op. 02698 (holding that the elements of depraved-indifference murder did not change between Register and October 19, 2004, when Payne was decided).

three people during an argument in a crowded bar, killing one. The defendant in that case had requested that the trial judge instruct the jury that it could consider evidence of voluntary intoxication in determining whether the defendant had acted "[u]nder circumstances evincing a depraved indifference to human life." The trial court refused to give the requested instruction, stating that the <u>mens</u> <u>rea</u> of depraved-indifference murder is recklessness, which cannot be negated by intoxication. <u>Register</u>, 60 N.Y.2d at 275, 469 N.Y.S.2d at 601. The Court of Appeals agreed, holding that the statutory language -- "under circumstances evincing a depraved indifference to human life" -- did not create a new category of <u>mens</u> <u>rea</u>. Rather, the Court explained, the <u>mens</u> <u>rea</u> of depraved-indifference murder is recklessness, as defined by section 15.05(3) of the Penal Law:

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

N.Y. Penal Law § 15.05(3). The <u>actus</u> <u>reus</u> of depraved-indifference murder, the <u>Register</u> Court held, is conduct creating a grave risk of death, and the phrase "circumstances evincing a depraved

indifference to human life" "refers to neither the *mens rea* nor the *actus reus*. If it states an element of the crime at all, it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occur[.]" Register, 60 N.Y. 2d at 276, 469 N.Y.S.2d at 601-602.

People v. Sanchez, 98 N.Y. 2d 373, 748 N.Y.S.2d 312 (2002), further clarified the legal significance of the phrase "under circumstances evincing a depraved indifference to human life." In that case, the defendant was convicted of depraved-indifference murder for shooting his victim to death. Sanchez and Range, boyfriends of two sisters who normally had a "cordial relationship," got into an argument at a party when Range implied that Sanchez was not faithful to his girlfriend. After Range told Sanchez to step outside, the only eyewitness saw Sanchez walk through a doorway from a hallway into a foyer away from Range, who was behind a partially opened door. Then, Sanchez abruptly turned around, fired a gun at Range's chest, and fled. At trial Sanchez was acquitted of intentional murder and convicted under a depraved-indifference theory.

The Sanchez Court characterized the issue on appeal as "whether, on this record, based on an objective assessment of the risk defendant recklessly created and disregarded, the likelihood of

causing death from defendant's conduct was so obviously severe that it evinced a depraved indifference to human life...an indifference to human life so depraved as to be deserving of the same punishment as intentional murder; that it was virtually a *knowing*, although not intentional, homicide." Sanchez, 98 N.Y. 2d at 384, 748 N.Y.S.2d at 318-19 (emphasis in original). The Court concluded that a rational jury could have found that "[the crime] was an instantaneous impulsive shooting -- perhaps to disable or frighten Range, rather than to kill him." Id. at 377-78, 748 N.Y.S.2d at 314. However, Sanchez's conduct involved such a high risk of death that it met "the level of manifested depravity needed to establish [depraved-indifference murder.]" Id. at 378, 748 N.Y.S.2d at 314.

In this case, we have no difficulty concluding that the evidence was legally sufficient to support petitioner's depraved-indifference murder conviction under Sanchez and Register. The objective risk of death recklessly created by petitioner's conduct was so high that his disregard of that risk evinced a depraved indifference to human life. See Sanchez, 98 N.Y. 2d at 384, 748 N.Y.S.2d at 318-19. According to witness testimony, petitioner and Saxon stomped on Pagan's head as he lay on the ground, and he was already unconscious when they rammed his head repeatedly into a metal security gate. (Tr. 1338-42, 916). The beating that petitioner and Saxon inflicted on Mr. Pagan was so severe that his skull and

facial bones were fractured and his windpipe was broken. (Id. at 1449-50). Rather than summon medical assistance, petitioner and Saxon "left him on the ground dropped, as if he was dead[,]" (Id. at 927), and "crossed the street like hugging each other and slapping each other five and stuff, laughing like it was funny." (Id. at 287). A rational jury could certainly have concluded on this record that petitioner engaged in reckless conduct that created such a grave risk of death that it evinced a depraved indifference to human life, and thus "deserve[d] the same societal condemnation as purposeful homicide." Sanchez, 98 N.Y.2d at 378, 748 N.Y.S. at 314.

Because the retroactivity of Payne was not clear until Policano, 7 N.Y.3d at 602-603, 825 N.Y.S. 2d at 688-89, the state court analyzed petitioner's legal insufficiency claim under Payne rather than under Register. Payne held that recklessness is not enough to constitute the mens rea of depraved-indifference murder, reaffirming its earlier statement in People v. Gonzalez that "the reckless conduct must be 'so wanton, so deficient in a moral sense of concern, so devoid of regard for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another.'" Payne, 3 N.Y.3d at 271, 786 N.Y.S.2d at 118 (quoting People v. Gonzalez, 1 N.Y.3d 464, 469, 775 N.Y.S.2d 224, 228 (2004)). Later, the Court stated explicitly in People v.

<u>Feingold</u> that "depraved indifference to human life is a culpable mental state." 7 N.Y.3d 288, 294, 819 N.Y.S.2d 691, 695 (2006). <u>Payne</u> further explained that "[t]he use of a weapon can never result in depraved indifference murder when...there is a manifest intent to kill." 3 N.Y.3d at 271, 786 N.Y.S.2d at 118. "Moreover, it should be obvious that the more the defendant shoots (or stabs or bludgeons) the victim, the more clearly intentional is the homicide." <u>Id.</u> at 272, 786 N.Y.S.2d at 119.

The state court in our case concluded that even under the more rigorous <u>Payne</u> standard, the facts of this case were sufficient to support a depraved-indifference murder conviction. Based upon the testimony as to the events at the grocery line that led to the altercation, the court found that "this was instantaneous, impulsive beating." (Magri Aff. at Ex. 24, p. 37). The facts adduced at trial, the court said, were "not exclusively consistent with an intentional killing," and the Pagan murder thus fell somewhere between a "manifest intent to kill" and "the antithesis of intentional murder." (<u>Id.</u> at 38). The state court concluded that because of its extreme brutality, the conduct in this case falls within a category of homicide classified in <u>Payne</u> as a species of depraved-indifference murder -- homicides in which "the acts of the defendant are marked by uncommon brutality -- coupled not with an intent to kill...but with depraved indifference as to the victim's plight." (Magri Aff. at Ex. 24, pp. 34-37 (quoting <u>Payne</u>, 3 N.Y.3d at 271,

786 N.Y.S.2d at 118-19)). Although the jury could reasonably have concluded that the killing was intentional, the court concluded that the jury also could have found that the petitioner and Saxon did not have the conscious objective of killing Pagan, but acted with depraved indifference as to whether or not the beating that they inflicted upon him would lead to his death. (<u>Id.</u> at 36-38). Thus, whether petitioner and Saxon intended to kill Pagan or not was a factual question for the jury to determine. (<u>Id.</u> at 37-38). The court therefore concluded that the evidence was legally sufficient to support petitioner's conviction for depraved-indifference murder. (<u>Id.</u> at 38-39).

As discussed, post-<u>Policano</u> it is clear that the proper formulation of the elements of depraved-indifference murder for purposes of this analysis is that which the Court of Appeals explained in <u>Register</u> and affirmed in <u>Sanchez</u>. Although the state court analyzed the merits of this claim under <u>Payne</u>, because <u>Payne</u> is a more rigorous standard than <u>Register</u>, its ruling that a rational trier of fact could find the <u>mens</u> <u>rea</u> of depraved indifference to human life necessarily implies that a rational trier of fact could also find the <u>mens</u> <u>rea</u> of recklessness, and that the circumstances of petitioner's conduct evinced a depraved indifference to human life. Thus, had the state court analyzed the

case under <u>People v. Register</u> rather than <u>People v. Payne</u>, its conclusion would have been the same.

We conclude that the state court's analysis of the legal sufficiency of the evidence was not an unreasonable application of federal law to the facts of this case, and indeed that its conclusion was manifestly correct under the governing law in New York. A rational trier of fact could have come out either way in deciding whether or not the beating that petitioner and Saxon inflicted on Mr. Pagan was done with the intent to kill him or simply with depraved indifference to whether or not he died. This is indeed, as the state court observed, "one of the very rare cases where the evidence supports submission of both counts of murder in the second degree to the jury." (Magri Aff. at Ex. 24, p. 40).

CONCLUSION

For the reasons we have noted, we recommend that the writ be denied and the petition dismissed with prejudice. Because petitioner has made a substantial showing that reasonable jurists could find it debatable whether he was deprived of his constitutional rights under <u>Brady</u>, we recommend that a certificate of appealability issue as to petitioner's <u>Brady</u> claims, but not as to his legal-

insufficiency claim. <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000); 28 U.S.C. 2253(c).

with extra copies to be delivered to the chambers of the Honorable Sidney H. Stein, Room 1010, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

Dated: New York, New York
       April 23, 2008

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed today to:

Richard Ware Levitt, Esq.
Law Offices of Richard Ware Levitt
148 East 78th Street
New York, NY 10021

Joshua F. Magri, Esq.
Karen P. Swiger, Esq.
Office of the District Attorney, Bronx County
198 East 161st Street
Bronx, NY 10451